Filed 8/1/24  P. v. Khan CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>DAVID KHAN,<br><br>　　　　Defendant and Appellant. | A165941<br><br>(San Mateo County<br>Super. Ct. No. 21NF002249A) |

　　　　David Khan appeals a judgment entered following his convictions for firearm-related offenses that he committed while subject to restraining orders precluding him from possessing firearms.  Khan, who represented himself at trial, contends he was prevented from presenting a defense; the trial court committed a prejudicial instructional error; and the prosecutor committed misconduct.  Khan contends further that his convictions violate the Second Amendment to the Federal Constitution.  And he seeks a new sentencing hearing, alleging several sentencing errors.  We affirm.

# BACKGROUND

## *Criminal Charges and Proceedings*

　　　　This case arose from a search of Khan's Daly City residence conducted on February 11, 2021.  In April 2021, the People filed an amended complaint charging Khan with offenses relating to his unlawful possession of weapons and ammunition.  Both parties waived a preliminary hearing, and Khan was

1

held to answer.  Thereafter, Khan filed a motion to replace his appointed private defender.  (*People v. Marsden* (1970) 2 Cal.3d 118.)

Meanwhile, on April 26, 2021, the San Mateo District Attorney filed an information charging Khan with five offenses, as follows.  Count one: possession of an assault weapon (Pen. Code, § 30605, subd. (a)).[1]  Count two: attempt to manufacture an assault weapon (§§ 664/30600, subd. (a)).  Count three:  possession of ammunition by a person prohibited from owning or possessing a firearm (§ 30305, subd. (a) (section 30305(a))).  Count four: purchase or receipt of a firearm by a person prohibited from doing so by a restraining order or protective order (§ 29825, subd. (a) (section 29525(a))).  Count five:  possession of a firearm with identification numbers removed (§ 23920).

Regarding count three, unlawful possession of ammunition, the People alleged Khan was subject to restraining orders barring him from possessing firearms and ammunition that were issued against him in multiple cases: one in San Francisco, one in San Joaquin, and three in San Mateo.  Regarding count four, the People alleged Khan knew he was prohibited from purchasing, receiving, or attempting to purchase or receive firearms by a temporary restraining order, an injunction, and a protective order.

Following the appointment of a different private defender, Khan pled not guilty to all charges.  Thereafter, he filed a motion to represent himself, which was granted on May 19, 2021.  (*Faretta v. California* (1975) 422 U.S. 806.)

A jury trial began on May 2, 2022, with the court ruling on multiple motions.  That day, the court granted the People's request to file an amended

---

[1] Statutory references are to the Penal Code, unless we cite a different statute.

information. The amendment did not add to or substantively change the charged offenses, except that as to count three the People deleted allegations that restraining orders had been issued against Khan in San Francisco and San Joaquin Counties, and based this charge solely on restraining orders issued in three San Mateo cases.[2] The evidence phase of trial was held over multiple court days in May 2022, with some delay when Khan's advisory counsel was temporarily unavailable.

***Trial Evidence—the Prosecution Case***

In January 2021, Khan lived on the top floor of a home in Daly City that had been divided into three units. Other tenants did not have access to the floor where Khan lived, which had its own door. Initially, Khan had rented the unit for himself and his wife and young son, but by early 2020 he lived there alone. In the spring of 2020, Khan's landlord, R.W., had noticed Khan had changed the locks to his unit. Khan told R.W. he changed the locks for his own security, and he refused to provide R.W. with duplicate keys despite numerous requests.

One day in late January 2021, R.W. went to the property to collect rent and mail and found Khan "working in the garage." There was a hand drill on the floor, and Khan was filing a metal bracket, attempting to enlarge a hole. When R.W. asked what Khan was doing, Khan said he was "modifying the trigger" on the bracket for an "AK-47 gun body." R.W. observed that the firearm assembly seemed "messed up," to which Khan replied that parts were " 'cheap,' " and he would get another one.

---

[2] Every version of the accusatory pleading contained allegations that Khan violated restraining orders issued in the same three San Mateo county matters: case no. 20-CIV-02271, case no. 20-NM-006433, and case no. 21-NM-001093.

3

During this time period, R.W. talked with Khan a few times a month. They were both Burmese, spoke to each other in that language, and R.W. had attempted to assist Khan with his court matters. Khan often talked about guns, and purchasing firearm components online. But, before the encounter in the garage in January 2021, Khan never mentioned anything about AK-47s to R.W. In early February, R.W. returned to the property to meet with Khan, who had called him about a court matter. R.W. found Khan in the garage, where he also found a "tabletop drill press" he had never seen before. R.W. thought Khan had been using the tool on metal objects, as "fragments" were flying around.

### *The Search of Khan's Residence*

On February 11, 2021, R.W. reported Khan's activities to the Daly City Police Department. The report was referred to Detective Ortega, who was familiar with Khan as a suspect in multiple cases involving "other types of crimes." Ortega was also aware Khan had a court appearance in Redwood City that day. He assigned Officers Shoopman and Poti to go to that location and take Khan into custody while he arranged for a search warrant of Khan's residence. After Khan was taken into custody, officers searched his vehicle, where they found a pistol holster in the back seat. Officers did not find firearms or firearm components in the car.

At around 5:30 p.m. on February 11, Detective Ortega executed a search warrant at Khan's residence with a team of officers that included Detectives Collins and Baroni. They found a yellow toolbox in a bedroom closet that contained approximately 580 rounds of ammunition, which included ammunition for an AK-47. From various rooms in the unit, officers collected firearm-related paraphernalia, including a target scope, night-vision goggles, and rifle handrails. Officers also found a laptop that contained a

4

video showing use of an AK-47, and evidence of recently visited websites from which people could purchase firearm-related merchandise. In an attic crawl space accessed via a panel in the hallway ceiling, officers found an AK-47-type rifle, and multiple loaded magazines, several of which were loaded with AK-47 caliber ammunition. In the garage, officers found a drill-press and a "lower receiver" for an AK-47.

### *Prior Contacts With Daly City Officers*

The defense cross-examined Detectives Collins and Baroni about their prior contact with Khan. Collins testified that the Daly City Police Department had numerous prior contacts with Khan and that he was personally involved in one prior encounter when he assisted in the service of an emergency protective order that restrained Khan "from a woman." Baroni testified that he had been at Khan's residence on a prior occasion in April 2020 when Khan was arrested in connection with a child endangerment incident, possibly for violating a restraining order. Baroni confirmed that after Khan was taken to jail in connection with the April 2020 incident, there was nobody at Khan's residence to monitor whether doors were locked, and security maintained.

### *Phone Calls From Jail*

In February 2021, Khan had telephone conversations with his mother that were recorded by the jail and subsequently transcribed and translated from Burmese to English. Excerpts from those conversations were introduced at trial.

On February 14, Khan told his mother he was arrested for having a "junk gun" that was "damaged and cannot be fired." He said that he "told them" the gun was not "workable," and if somebody were to get injured, it

5

would be "their fault." Khan told his mom that he could not be charged because "[t]he moment the gun is cocked, it will fall to pieces."

On February 16, Khan's mother asked him why he was arrested, to which Khan replied: "For disobeying court order. Then they said they found bullet ammunition in the house which were legally applied for. They were confiscated." Khan went on to explain to his mother that "they cannot open a case according to the law" because the gun was "useless and damaged." When Khan's mother referred to Khan's "gun craziness," he assured her that "they cannot do anything" because the "gun has been done in such a manner it cannot be fired."

On February 20, Khan told his mother that he kept telling the police that the "AK 47 is a piece of junk, incomplete, not functional since 2019."

### *Evidence Regarding Firearms and AK-47s*

The prosecution presented testimony from two witnesses who examined the firearm and receiver recovered during the search of Khan's home. Agent Smith, from the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), testified about the characteristics of an AK-47. Smith examined the firearm that was found in Khan's attic, and identified it as an "AK-47-type rifle" that had been personally manufactured. Smith also examined the receiver that was recovered from the garage, which he described as an unfinished receiver for an AK-47 that could be finished with a drill press by creating holes for pins that would hold together the trigger assembly.

Daly City Police Officer Hart testified about his experience with firearms, including the fact that on May 3, 2022 he had test fired the firearm recovered from Khan's attic. At the Department's range, Hart "successfully" fired the rifle. Both times he shot the firearm, a "dust cover" popped off the weapon, but he testified that the dust cover does not affect the functionality

6

of an AK-47. Video of Hart firing two shots from the weapon was admitted into evidence at trial.

### The Defense Case

During his opening statement and closing argument, Khan did not articulate a coherent defense to the charges against him. Outside the presence of the jury, Khan expressed his intention to show that he was the victim of police harassment. Khan called several witnesses over the course of three days. On the second day, he elected to testify on his own behalf.

#### Defense Witnesses Who Testified Before Khan Took the Stand

Khan began his defense by eliciting testimony from two criminalists employed by the San Mateo Sherriff's Office, Jack Krimmer and Theresa Santos. Krimmer testified that in March 2021, he received a request from the Daly City Police Department to examine an "AK-47-type stripped lower receiver" and a "AK-47-type semiautomatic rifle." The receiver was incomplete and by itself could not be a firearm. The rifle functioned without any problems. Santos testified that she tested these same items for latent fingerprints and was unable to recover any. Khan's next witness was ATF Agent Smith, who once again testified that he would classify the receiver as an "AK-style or AK-variant rifle" that was not "completely finished," but could be made into a firearm.

Khan's final witness of the day was Daly City Police Officer Poti who testified that he and Officer Shoopman took Khan into custody on the afternoon of February 11, 2021. Khan asked Poti whether he had been at Khan's house in January 2021, eliciting a relevancy objection. Khan responded that he was "[b]uilding the foundation that Daly City Police Department have been harassing and being prejudice on David Khan for the whole year." The court sustained the relevancy objection "for the time being,"

7

stating it would address the matter with Khan later. Poti went on to testify that he did not at "anytime" go to Khan's residence to participate in executing a search warrant.

Outside the presence of the jury, the trial court returned to the question whether Khan's prior interactions with police, including a prior arrest by Officer Poti, were relevant to the current charges. The court opined that the fact Khan was arrested previously was not sufficiently probative of harassment, and explained to Khan that if he presented evidence of prior arrests that would open the door for the prosecution to offer evidence about collateral matters, which would be time consuming and prejudicial to Khan. Khan stated that he did "understand," but maintained that prior interactions with law enforcement and the legal system were relevant to his defense. The only concrete basis for this view was an assertion that Khan's "family issue" became an "opportunity" for officers to retaliate against him for filing a federal racketeering lawsuit against the Police Department and District Attorney in 2019.

Since Khan had attempted to ask Officer Poti about a January 2021 arrest, the court inquired about the status of Khan's federal case as of that time. Khan represented that in January 2021, he was "waiting" for "summary judgment" in his "RICO" case. The court asked if the defense would offer evidence about the federal lawsuit, to which Khan responded, "It will be on if I . . . get on the stand and testify." The court reiterated a prior advisement that the decision whether to testify was "completely [Khan's] choice," but without evidence of the federal lawsuit or a representation that such evidence would be forthcoming, Khan's prior arrests were irrelevant, the court found. Khan stated he would testify and explain why the arrests were relevant facts, but he did not want to say ahead of time. Ultimately, the

8

court ruled that Poti would be subject to recall, and once Khan presented evidence of his defense, the court would revisit whether he could ask Poti and other officers about prior arrests.

### *Khan's Testimony*

The following court day, Khan announced in front of the jury that he would testify on his own behalf. Khan testified that he was married, had a child, and had lived in Daly City for 15 to 20 years, where he worked from home as a computer consultant. Then Khan turned to the charges filed against him in this case, reading or paraphrasing from the original complaint. When Khan testified that he was charged with possession of "a 50-BMG" rifle the court struck his testimony on the ground that "[t]here is no 50-BMG weapon involved in this case." The court stated that the charges had already been read, and although Khan could tell the jury the charges again, he could only read from admissible evidence. Khan attempted to continue to read from the complaint, but was admonished to put it away as it was not the operative document. Then Khan discussed multiple interactions he has had with the Daly City Police Department. Khan's testimony was confusing and disjointed. From it, we recount information that appeared to be relevant from Khan's perspective.

The first incident Khan discussed occurred on April 20, 2020, when officers came to his home, "claim[ed] that there was a verbal altercation between families," and that an emergency protective order was issued because of the altercation. According to Khan, as many as eight officers surrounded his home and then Detective Scholes handed him an emergency protective order "barring" him from his child and wife. Khan questioned the authenticity of the order, told officers he was "not going to deal with any false document," and closed the door. Then he agreed to give Scholes a statement

9

in his garage, but when he went downstairs officers had already entered without a warrant. The police requested that Khan surrender firearms that he had legally purchased. When Khan refused, invoking his Second and Fifth Amendment rights, officers forcibly entered his home, arrested him, conducted a warrantless search, and seized his firearms and ammunition.

Khan testified that "the protective order" that was issued against him was based on information provided by a person who does not understand or speak English very well and spoke to the police because she was worried about getting "in trouble." Khan believed that the police had used that information to "manufacture" an "accusation [of] child abuse" and to make up "all sort of" other accusations.

On May 7, 2020, Khan had another interaction with the police following his release from jail. He went to the police station to file a complaint for officer misconduct and use of force causing him injuries, and spoke to Sergeant Bussalacchi. But "instead" of taking Khan's complaint, the officer "confronted" Khan, which led to an argument about legal issues and Khan telling the officer that a person who is unlawfully assaulted has the "right to defend themself for their liberty," and that he would defend himself by "any mean[s] necessary."

Khan testified that after he was released from jail, he was not allowed to return home for several weeks, except for "a few minutes" to gather "money or whatever," and that is when he first discovered his property was missing. On May 12, he filed a missing property report, and two days later received a call from Sergeant Moala, who said he needed an additional form. When Khan went to the station to complete the form, Moala served him with an emergency gun violence restraining order, handcuffed him and transported him to the hospital by ambulance for a "5150." After spending a few hours at

the hospital, Khan was released, as there was "no mental health issue or physical issue." Khan testified that when he was finally able to return to his home on May 29, he could not find "a lot of stuff," including his firearms and ammunition. He and his cousin tried to find out what had happened to his property, but to no avail. Then, on June 11, police officers "spread out throughout" the city to find him and serve him with the gun violence restraining order and notice to appear in court, even though he had no firearms or ammunition.

Khan testified that at the same time he was dealing with issues arising out of the April 2020 search of his home, he was involved in divorce and child custody proceedings. He recalled that on May 28, 2020, the district attorney obtained a "domestic violence restraining order" again him without obtaining the consent of the "other party." Subsequently, when he personally served documents in family law matters, he was charged with violating the restraining order.

The next police encounter Khan described occurred on July 15, 2020. Seven or eight officers appeared outside his home, including Detective Ortega, and Officer Poti. When Khan stepped outside, he was taken to jail for violating an unspecified restraining order.

On January 7, 2021, Detectives Ortega and Collins served Khan with another protective order while he was at the federal court building in San Francisco, Khan testified. According to Khan, in that matter he had contacted his marriage counselor only to ask for help, but the Police Department "manufacture[d] the emergency protective order," claiming that he was "threatening in nature" and that the counselor was in "fear for her life."

Khan recounted an incident on January 22, 2021, when officers tried to arrest him for failing to appear in court, and a standoff ensued. Khan was "frustrated," and said, " 'You guys will not get me alive,' " then put a knife to his throat and threatened to kill himself. The officers left, and the following week Khan was told not to appear in court, but he later found out another protective order was issued against him. Then, on January 27, Khan was at the supermarket when Officer Poti and another officer arrested him again, and after he was released from jail, Khan stayed "away from Daly City to avoid any more abuse."

The next incident in Khan's narrative was the February 11, 2021, search that gave rise to the current charges. Khan recalled that after spending most of the day in court, he was placed under arrest without being given a reason. Eventually, his court-appointed attorney asked him if he had firearms, and he reported that he had none, and that anyone could search his house. Later that night, Detective Ortega "confronted" him after executing the search warrant and said they found guns, "machines" to make guns, and ammunition. Khan was surprised and told Ortega, " 'You guys already took everything. I have nothing.' " Months later, Khan obtained a copy of the search warrant and discovered Ortega had submitted an affidavit that allegedly included false information, stating that one of several restraining orders against Khan had been issued in March 2020, although Khan believed the first order against him was not issued until May 2020.

Khan testified that the "main reason" the Daly City Police Department and the San Mateo County District Attorney "went after" him was because he had made a "RICO complaint at the federal level." Khan testified that he filed that federal case in October 2019, and summary judgment was filed in March 2020, the month before Daly City Police came and arrested him at his

12

home. In June, the case was dismissed with prejudice, but an appeal was still pending, Khan testified.

Regarding his possession of firearms, Khan testified that he used to be a collector before the police took his guns, and that he previously purchased a firearm for his wife to use for her protection. Khan and R.W. used to make videos about building firearms, but he testified that "we never finish[ed] the firearm, only just partially how it works." Khan maintained that the firearm recovered from his attic in February 2021 could not belong to him because he is afraid of heights and would not have been able to get on a ladder, and that the toolbox was not his either. He pointed out there were no prints on the gun and opined that nobody keeps a toolbox in a bedroom closet. As for phone conversations he had with his mother while he was in jail, Khan testified that he "intentionally" made up stories about the firearm having missing parts because he knew that he was being recorded.

Under cross-examination, Khan was asked about his federal case. He elaborated that he also sued the Pinole Police Department and another district attorney, alleging a conspiracy to protect a "felon on probation" who stole property from him. Khan refused to acknowledge that case was dismissed in favor of defendants or that his appeal was denied. He insisted that he filed for summary judgment in March 2020, and after that the case did not proceed because of the pandemic. He testified his case was later dismissed because his wife no longer wanted to participate, and he maintained his appeal was still pending. Later in his testimony, Khan acknowledged his appeal was dismissed but claimed he did not receive notice, and then opined that his federal lawsuit was not in "any" way "relevant for this case."

Khan was cross-examined about restraining orders issued against him in San Mateo County matters. He acknowledged that a domestic violence restraining order was issued on May 4, 2020, in case no. 20-NM-006433-A. He claimed not to understand that when the order was terminated, it was replaced with another restraining order. And he objected on relevancy grounds when asked if the order was reissued because he had been convicted of 35 violations of the original restraining order. After his objection was overruled, Khan acknowledged he had been convicted of 35 counts of restraining order violations. (See § 166.)

The prosecutor asked Khan about a restraining order issued in case no. 21-NM-001093, which involved the marriage counselor. Khan acknowledged he was served with the order in January 2021, but testified that he did not know an actual case had been filed against him until the following March. Khan also acknowledged that a gun violence restraining order was issued against him in case no. 20-CIV-02271, he was served with the order, and the order was reissued in July 2020.

Khan acknowledged that he was also served with a family violence restraining order that was issued on October 23, 2020 in his family law case (case no. 20-FAM-00875). The People relied on this order (as well as the domestic violence restraining order) to prove the count 4 charge of violating section 29825, subdivision (a), which prohibits purchasing or receiving a firearm in violation of a protective order. Although Khan acknowledged this protective order, he denied that it had been obtained by his ex-wife, testifying that the district attorney obtained it without her consent.

***Other Defense Witnesses***

The prosecution's cross-examination of Khan was interrupted so that Khan could call three witnesses with timing constraints. First, Khan

14

examined Mr. Leong, the Burmese interpreter who translated the transcribed phone calls between Khan and his mother. But Leong confirmed the accuracy of his translation, testifying that Khan had *not* told his mother the ammunition was "previously" confiscated.

Then Khan called his cousin, S.K., who testified that he lived with Khan from February 2020 until May 2021, and that before he moved out, S.K. did not see a yellow toolbox in Khan's home, nor did he ever see Khan go up in the attic.

Khan also re-called R.W., who testified that he had a key to a side door of the garage that still worked after Khan changed the locks to his residence. R.W. denied ever going into the attic of the property and testified he provided Khan with notice before going into Khan's residence.

At the end of his case, Khan re-called two officers who testified during the prosecution case. He elicited testimony from Detective Baroni about weapons and a bag of ammunition police seized from his home in April 2020. Baroni testified that the April 2020 seizure resulted in issuance of an emergency protective order that Khan subsequently violated. Khan examined Detective Collins about R.W.'s February 11, 2021 report about Khan. Collins testified that R.W. told him where Khan would be that day. Collins also recalled that R.W. had initially said he was in Khan's attic on February 9, but then clarified that he had never been in the attic. Collins understood R.W. to be saying that he had been in Khan's top floor unit on February 9.

### The Rebuttal Case

As their rebuttal case, the People offered several exhibits and two stipulations. First, the parties stipulated that Khan's federal cases were appealed and dismissed by the Ninth Circuit in July 2021. Second, in case

15

21-NM-001093-A, which involved contact with the marriage counselor, court records showed Khan was not present at the protective order hearing, so the prosecution would not rely on that order "as a basis in this case."

### *Jury Verdicts and Sentence*

Before the case was submitted to the jury, the charge for possession of a firearm with identification numbers removed (count five) was dismissed pursuant to the People's request, and the charge for attempting to manufacture a firearm (count two) was dismissed by the court for insufficient evidence. The jury found Khan guilty of the three remaining charges: possession of an assault weapon; possessing a firearm in violation of a protective order; and possessing ammunition in violation of a protective order. The trial court sentenced Khan to an aggregate term of three years and eight months in prison.

## DISCUSSION

### I. Khan's Opportunity to Present a Defense

Khan's first claim of error is that the trial court's evidentiary rulings prevented him from presenting his defense. Khan does not cite any case authority supportive of this claim of error, and his factual analysis is unavailing.

The federal constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. (*Crane v. Kentucky* (1986) 476 U.S. 683, 690; *People v. Ahmed* (2018) 25 Cal.App.5th 136, 144.) A defendant is denied the right to present a defense if the trial court excludes evidence that is vital to that defense. (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) "The principle applies, however, only to 'relevant and material' evidence." (*Ibid*.) Moreover, "[a]s a general matter, the '[a]pplication of the ordinary rules of evidence . . . does not impermissibly infringe on a defendant's right to

present a defense.' [Citations.] Although completely excluding evidence of an accused's defense theoretically could rise to this level, excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) If the trial court rejects some evidence concerning a defense without precluding the defendant from presenting a defense, any error "is one of state law," which is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. McNeal* (2009) 46 Cal.4th 1183, 1203; see *Fudge*, at p. 1103.)

Applying these principles, we reject Khan's claim of error. Khan was not barred from attempting to present a defense. He cross-examined prosecution witnesses, called multiple witnesses during his defense case, and described issues and events that he deemed important during his own direct testimony. Despite the wide latitude afforded to him, Khan failed to prove a legally recognized defense to the charges in this case.

Khan's appellate counsel argues that the trial court erred by creating a "Catch-22 relevance situation" whereby Khan was precluded from presenting evidence that would have supported his claim that he was " 'railroaded.' " If such evidence existed, Khan did not make it known by way of an offer of proof, nor does he bring it to our attention on appeal. Moreover, to the extent Khan is contending that erroneous evidence rulings prevented him from presenting a valid defense, he is mistaken. To highlight the flaws in this claim of error, we address separately the rulings about which Khan complains.

**Filing the Amended Information:** Khan objected at trial to the information being amended, arguing that the originally alleged out-of-county restraining orders were fabricated evidence. The trial court overruled the objection, reasoning that the amendment benefited Khan by clarifying the

17

prosecution's trial theory without materially changing the charges. This ruling is reviewed for abuse of discretion (*Short v. Superior Court* (2019) 42 Cal.App.5th 905, 913), which Khan fails to show. "An information may be amended 'for any defect or insufficiency, at any stage of the proceedings,' so long as the amended information does not 'charge an offense not shown by the evidence taken at the preliminary examination.'" (*People v. Goolsby* (2015) 62 Cal.4th 360, 367, quoting § 1009.)

Claiming he was prejudiced by the amendment, Khan contends the trial court used the amended information to preclude him from referring to the "original complaint," even though he was claiming that complaint contained false allegations. The record shows that Khan was precluded from reading the original complaint because (1) it was not in evidence, and (2) Khan appeared to be testifying that the complaint contained the charges he wanted to dispute. We find no abuse of discretion in this ruling. "To be admissible in evidence, a writing must be relevant and authenticated." (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266, citing Evid. Code, §§ 350, 1401.) This ruling did not prevent Khan from attempting to show that the charges the jury was actually being asked to decide were false, and a narrowing amendment is not evidence that evidence against Khan had been fabricated.

**Admitting Redacted Phone Calls**: The prosecution offered redacted versions of the February 2021 phone calls between Khan and his mother. Initially, Khan objected that he would rather have the entire conversations admitted because he wanted the jury to hear how many times he had been arrested over the course of the whole year. The court explained that redactions could be warranted to prevent the jury from hearing prejudicial matter, and subsequently found that redactions proposed by the prosecutor

18

were appropriately limited to matter that was either inadmissible or prejudicial to Khan. Specifically, Khan's remarks to the effect that people were trying to put him away for five years constituted improper reference to potential punishment, and discussion of domestic violence matters was prejudicial to him. The court also required additional redactions to eliminate references to bail issues. Khan objected that he wanted to include evidence of his right "not to [have] excessive bail," but the court overruled the objection, finding that bail issues had nothing to do with whether Khan was guilty of the charges. Then the court discussed each phone call and what language to redact. At the conclusion of that exercise, Khan expressed his approval, and when the court asked if he was "okay with the redactions," Khan said "Yeah."

On appeal, Khan argues the court should not have redacted references to prior arrests or bail issues, as they were obviously important to the defense Khan was attempting to present. Tellingly, Khan does not actually articulate a theory of relevancy. Khan's statements to his mother about his prior arrests and current bail issues was not evidence that his arrests were unlawful. Moreover, Khan overlooks that he expressly approved the redactions that the court made. (*People v. Smith* (2001) 24 Cal.4th 849, 852 ["As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal' "]; see also *People v. Torres* (1962) 201 Cal.App.2d 290, 295 [having consented to admission of evidence, appellant may not object to it on appeal].)

**Restrictions on Examining Police Officers:** As our background summary reflects, the trial court ruled that Khan could not examine Officer Poti or other officers about Kahn's prior arrests without first establishing those events were probative of a valid defense to the current charges. Again, Khan fails to show an error in this ruling. At trial, Khan's apparent theory

19

was that the simple fact he was arrested so many times was proof of harassment. The trial court did not abuse its discretion by rejecting that argument. (Evid. Code, §§ 350, 352.) Moreover, Khan's only concrete theory for connecting alleged prior harassment to the current charges was that he had named the Daly City Police Department as a defendant in his 2019 federal lawsuit. Despite representing to the court that he was awaiting summary judgment when Officer Poti arrested him in January 2021, Khan later admitted his lawsuit was dismissed in July 2020 and that his federal case was not even relevant to this case.

Khan intimates that it was unfair for the court to prevent him from eliciting testimony about his prior arrests when the court had already prevented him from introducing booking sheets and arrest reports pertaining to those prior incidents. But Khan does not show, or even contend, that those documents were admissible evidence.

**Khan's Decision to Testify**: Khan contends the trial court "induced" him to testify at trial, as that was the "only way he could present the defense issues he wanted to present to the jury." Khan submits this alleged inducement was prejudicial error since he incriminated himself when he testified at trial. Khan fails to support this contention with any legal analysis, and we consider this argument unsound.

First, it is hardly the trial court's fault that the only witness Khan was able to identify with evidence that Kahn was being harassed by the police was the defendant himself. Kahn never provided an offer of proof to suggest that any other witness had evidence that would support his theory, so his felt need to testify cannot be attributed to the trial court having excluded other evidence.

20

Second, it was not the trial court's responsibility to warn defendant away from taking the stand. "[A] 'defendant who chooses to represent himself assumes the responsibilities inherent in the role which he has undertaken.'" (*People v. Barnum* (2003) 29 Cal.4th 1210, 1221–1222.) This principle extends to decisions whether to testify. "[A] defendant who chooses to represent himself or herself after knowingly, intelligently, and voluntarily forgoing the assistance of counsel assumes the risk of his or her own ignorance, and cannot compel the trial court to make up for counsel's absence. Such a defendant therefore cannot reasonably expect the trial court to provide an advisement of any right, including the privilege against compelled self-incrimination." (*Id*. at p. 1226.)

## II. Khan Fails To Show Jury Instruction Error

Khan contends the trial court erred by instructing the jury with a modified version of CALCRIM No. 371, which stated: "If the defendant tried to create false evidence, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself."

"A trial court in a criminal case is required to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Cruz* (2016) 2 Cal.App.5th 1178, 1183.) "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute ground for reversal." ' " (*People v. Cross* (2008) 45 Cal.4th 58, 67.) "Such error does not implicate the defendant's constitutional rights and is subject to harmless error review." (*People v. Falaniko* (2016) 1 Cal.App.5th 1234, 1247,

21

disapproved on another ground in *People v. Canizales* (2019) 7 Cal.5th 591, 607-608, fn. 5.)

Applying these principles, we reject Khan's claim of error. Khan does not dispute that the CALCRIM instruction constitutes a correct statement of the law. He contends only that it does not apply. We disagree. Khan testified that because he knew his jail phone calls were recorded, he told his mother, " 'I am going to make up this story,' " and then he intentionally said things he had no reason to think were true, namely that the gun police found in his home was missing parts, not functional, and could not be used to convict him of a crime. From Khan's testimony, the jury could have concluded that he tried to create false evidence, as the trial court found.

On appeal, Khan acknowledges his testimony warranted an instruction that false or misleading statements by the defendant may be evidence of a consciousness of guilt. (CALCRIM No. 362.) But he argues that giving CALCRIM No. 371 was error because there is no evidence that he specifically intended to fabricate evidence, as opposed to simply being reckless with the truth. We are unpersuaded by this logic and again Khan fails to cite legal authority. For CALCRIM No. 371 to be given, the evidence "need not conclusively establish fabrication." (*People v. Kerley* (2018) 23 Cal.App.5th 513, 565.) The instruction applies when there is "some evidence in the record that, if believed by the jury, would sufficiently support the suggested inference." (*People v. Alexander* (2010) 49 Cal.4th 846, 921.)

## III. Khan Fails to Prove Prosecutorial Misconduct

Khan contends the prosecutor committed misconduct during closing argument. " 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that

does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Montes* (2014) 58 Cal.4th 809, 869.) As Khan does not contend the prosecutor used deceptive or reprehensible methods, the issue is whether the challenged conduct was so unfair as to deny him due process.

Khan objects to portions of the prosecutor's closing that discussed Khan's admission about lying during the February 2021 phone calls with his mother. Specifically, the prosecutor argued Khan's testimony showed that either he was lying about "the weapon's operability," or he "made up false evidence" in saying that he had a junk gun, which was inconsistent with his testimony that he had no firearm at all. And later in her argument, the prosecutor stated that when Khan was confronted with the statements he made about the gun not being functional, he brushed the admissions off as "planting this evidence to throw people off track."

Khan contends the prosecutor committed misconduct because her assertion that Khan "admitted" planting false evidence is not supported by evidence. Khan failed to preserve this claim of error by making a timely objection in the trial court. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275 [" ' "only if an admonition would not have cured the harm is the claim of misconduct preserved for review" ' "].) Further, as we have explained, Khan's testimony about how he was " 'going to make up this story' " provided some evidence to support the prosecution's theory. " ' " '[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*People v. Hill* (1998) 17

23

Cal.4th 800, 819.)  Here, urging the jury to draw the inference that Khan was planting false evidence was not misconduct.

## IV.  Khan Fails To Show Prejudicial Sentencing Error

Khan contends he is entitled to a new sentencing hearing due to multiple trial court errors.  Generally, sentencing decisions are reviewed for abuse of discretion.  (*People v. Ogg* (2013) 219 Cal.App.4th 173, 185; see *People v. Sandoval* (2007) 41 Cal.4th 825, 847 (*Sandoval*).)  Claims of legal error in sentencing are reviewed de novo.  (*People v. Superior Court* (*Frezier*) (2020) 54 Cal.App.5th 652, 659.)

### A.  Additional Background

Khan's sentencing hearing began on July 22, 2022, but was continued to August 8 because the parties had only recently received the probation report.

#### *The Probation Report*

On July 13, 2022, the probation department submitted its report and recommendations to the court.  The department reported that Khan denied responsibility for his current offenses and claimed he was the victim of judicial abuse and prosecuted due to his race and background, and that county officials were corrupt.  Recommending that the court deny Khan probation, the department delineated several aggravating factors and reported there were no mitigating factors.

The report discussed Khan's prior offenses, which consisted of multiple misdemeanor convictions that were adjudicated on March 25, 2021, in one of the San Mateo cases that involved a restraining order.  The department reported that Khan had "prior misdemeanor convictions for cruelty to a child by endangering their health, battery against a peace officer, for obstructing or resisting a public officer, and for making annoying telephone calls."  The

24

report also summarized the incidents that resulted in these convictions: After a verbal altercation with an adult victim, Khan threw two firearms onto a bed in front of the child victim. Later, he threw ammunition on the floor, again in front of the child. The adult victim hid the guns and ammunition from Khan and reported the incidents to a marriage and family therapist, which led to issuance of a protective order. When officers went to Khan's residence, he refused to accept service of the protective order and to relinquish his firearms, resisted arrest and spat on an officer. Thereafter, Khan repeatedly violated the no-contact order by calling and emailing the victim.

### *First Session of the Sentencing Hearing*

On July 22, the trial court flagged several issues for the parties to be prepared to address at the continued hearing.

The first issue pertained to custody credits. The court stated that the probation report indicated Khan had been in custody since his arrest in February 2021, but it did not address how to divide credits between this case and Khan's other criminal case, for which he was still serving a sentence. The court advised the parties that it had requested a calculation and shared the probation officer's response that Khan had 368 actual days of custody credit in the prior case. But that figure conflicted with the prior case file, which showed that, as of April 29, 2022, Khan had been awarded 442 actual days of credit time in that case. After confirming the higher number with the trial judge in Khan's other case, the court calculated that Khan's three-year sentence would be completed on August 13, 2022.[3] Thus, the first issue the

---

[3] The court explained that the three-year sentence in Khan's prior case was 1,095 days, which required 548 actual days (assuming double for good conduct). "So if he had 442 actual days on April 29, he would need another

court asked the parties to consider was whether they agreed with the court's calculation because if the court ordered Khan's sentence in this case to run consecutively to the prior matter, Khan had zero credits, as he would not start earning credits toward his sentence in this case until August 14.

The court also flagged other material issues, albeit briefly. It observed that section 654 was relevant, but also opined that section 654 might not apply to any of the three convictions because there was more than one firearm and a large quantity of ammunition was possessed separately. The court also advised Khan that it was considering imposing an upper term sentence, and consecutive sentences for the offenses he committed in this case.

### *The Continued Hearing*

The court addressed two issues Khan had raised before announcing Khan's sentence. First, Khan accused the court of racially motivated hostility, which the court denied. The court stated that it based its sentencing decisions solely on the facts of the case, Khan's history, the probation report, and sentencing memos. The court also made clear that it had significant concerns about Khan that had nothing to do with his race, but pertained to his "volatile temper with no regard for the rules or the laws that apply just to society in general," and to the fact that Khan was in possession of "an assault weapon with hundreds of rounds of ammunition," which was "a recipe for disaster in the community."

The second issue Khan raised was an allegation of improper ex parte communication between the trial judge in this case and the trial judge in Khan's prior case. The court explained again that there was a discrepancy

---

106 [days] to get to that 548 number and be done with his sentence on the [other] matter."

regarding custody credits and that the court contacted the trial judge in Khan's other case *only* to confirm the number of credits that were awarded in that other case.

Turning to Khan's sentence for his current offenses, the court imposed an upper term for purchasing or receiving a firearm by a person subject to a restraining order or protective order (count four). The court based this decision on the circumstances of Khan's prior convictions. While those convictions were all adjudicated in a single case, Khan was charged with "40-plus counts." And although his crimes were misdemeanors, his convictions were for violating a protective order on multiple occasions over multiple dates, and resulted in a sentence of three years in custody. Moreover, the charges in the prior case were pending when Khan committed the felonies in this case. *Under these circumstances*, the court opined that "to give him a lower sentence here than he received on that misdemeanor case for more serious conduct while that case was pending is just illogical and not warranted."

The court next found that it would impose a consecutive sentence for unlawful possession of ammunition (count three), finding no mitigating factors, and relying on aggravating factors other than Khan's prior convictions. Specifically, the court relied on the serious nature of Khan's conduct underlying the current offenses, including that he hid the assault weapon in an attic and then denied doing so, which indicated a "nefarious intent." Moreover, he had "600-plus rounds of ammunition," and there was evidence of a plan to build a second AK-47 style weapon. The court also found that Khan was a danger to society, and showed "absolutely zero remorse" or insight about his own behavior. In addition, the court found it "significant" that Khan had perjured himself a trial. The court provided a

27

non-exhaustive list of examples to support this perjury finding: Khan testified that he did not put the firearm in the attic because he never went in the attic; Khan denied the yellow toolbox was his, testifying that his toolbox was red; he made up the story about the gun not working; and he denied having any ammunition.

Ultimately, the court imposed an aggregate prison sentence of three years and eight months: a three-year upper term for possession of a firearm in violation of a restraining order; a consecutive term of eight months for possession of ammunition (one-third of the midterm); and a three-year upper term for possession of an assault weapon, which was stayed under section 654.

## B. Consecutive Sentences

Khan contends the decision to impose a consecutive sentence for possession of ammunition was error because the court relied on the fact that Khan committed perjury. A court may enhance a defendant's sentence upon finding that he or she committed perjury. (*People v. Howard* (1993) 17 Cal.App.4th 999, 1004.) "[W]hen imposing an aggravated sentence because of perjury at trial, the sentencing judge is constitutionally required to make on-the-record findings encompassing all the elements of a perjury violation. In California, those elements are a willful statement, under oath, of any material matter which the witness knows to be false. (Pen. Code, § 118.)" (*Howard*, at p. 1004.)

Here, the record shows that the trial court followed *Howard* and made findings encompassing all the elements of a perjury violation. Khan does not argue otherwise. Instead, he contends that the finding that he committed perjury by telling his mother the story about nonfunctioning firearms was an error of law. We agree with Khan that lies he told his mother during their

28

recorded phone calls did not constitute perjury because those statements were not made under oath. And we concede for purposes of argument that the court's statement Khan "made up a story to the police department regarding the gun not working," may have been a reference to Khan's lies on the call to his mother, although the court may instead have been referring to Khan's sworn testimony that he made these statements in an intentional effort to have them recorded by law enforcement. But we reject Khan's contention that relying on perjury as an aggravating factor was error. As Khan concedes, the court cited several instances when Khan perjured himself, and said the examples it cited were "not meant to be exhaustive." Khan does not dispute the other statements were made under oath or that they support the court's finding that Khan committed perjury.

Khan contends he is entitled to resentencing because the record does not "clearly indicate" that the court would have imposed a consecutive sentence had it understood that the lie he told his mother was not perjury. (Citing *People v. Lopez* (2022) 78 Cal.App.5th 459, 468.) Under *Lopez* a resentencing hearing is warranted when "it is reasonably probable that a more favorable sentence would have otherwise been imposed absent the trial court's improper reliance" on a sentencing factor. (*Id.* at p. 467.) Here, the court did not improperly rely on the perjury aggravating factor, although it cited one arguably erroneous example in its nonexhaustive list of Khan's lies under oath, and it relied on several other valid aggravating factors, as discussed above. Khan acknowledges that the erroneous perjury example was only part of a "cumulative" list of factors, but he believes that it disproportionally weighed in the court's sentencing decision, thus warranting a new hearing. We disagree. On this record, we find no probability that the

29

court would exercise its discretion differently if it had not considered statements Khan made to his mother as evidence of perjury.

## C. The Upper-Term Sentence

Khan argues the trial court erred by imposing an upper term based solely on the fact that Khan suffered one prior misdemeanor conviction. To support this claim of error, Khan relies on the language of rule 4.421(b)(2) of the California Rules of Court, which counts as a factor in aggravation that the "defendant's prior convictions as an adult . . . are numerous or of increasing seriousness." Khan posits that since this rule refers specifically to prior convictions in the plural, his single prior conviction does not constitute an aggravating factor.

We need not decide whether a single prior misdemeanor can constitute an aggravating sentencing factor because Khan had multiple prior convictions. According to the probation report, Khan's prior convictions included cruelty to a child by endangering the child's health (§ 273a, subd. (b)), battery against a peace officer (§ 243, subd. (b)); four counts of obstructing or resisting a public officer (§ 148, subd. (a)(1)); 25 counts of contempt of court (§ 166, subd. (c)(1)); and making annoying phone calls (§ 653m, subd. (b)). The probation officer reported that although Khan's convictions were for "misdemeanors, his criminal behavior, past and present, are serious in nature and of concern."

Khan acknowledges he was convicted of multiple counts in his prior case, but he insists that he suffered only a single misdemeanor conviction. Khan does not cite authority for his definition of a conviction, or explain why he believes that being convicted of multiple counts for crimes committed over multiple days qualifies as only one conviction. Although the term may have more than one meaning, generally "where the existence of a prior conviction

30

triggers increased punishments, courts interpret 'conviction' to mean the factual ascertainment of guilt by verdict or plea." (*People v. Williams* (1996) 49 Cal.App.4th 1632, 1637.) Moreover, in "charging an offense," each count of an accusatory pleading "shall be sufficient if it contains in substance, a statement that the accused has committed some public offense therein specified." (§ 952.) Here, the record shows that Khan was convicted of multiple criminal offenses, which is sufficient proof of his multiple prior convictions.

In another argument, Khan contends the court erred by basing its sentencing choice on a general principle of logic; he claims that the only reason the court imposed an upper term was because it believed the current sentence in a felony case had to be longer than the sentence imposed in Khan's prior misdemeanor case. Khan posits that the court's alleged reliance on this logic violated its obligation to make "an 'individualized consideration of the offense, the offender, and the public interest.' " (Quoting *Sandoval, supra*, 41 Cal.4th at p. 847.) We disagree with Khan's interpretation of the court's ruling. At the hearing, the court expressly relied on the probation report, which contained a detailed summary of the prior case. The court highlighted some of these details: that Khan's prior convictions were numerous and serious even though they were misdemeanors; and that Khan had already been charged with those prior crimes when he committed the current felonies, which were more serious crimes. This was an individualized assessment, not rote application of an abstract principle.

### D. Custody Credits

When the court announced Khan's sentence, it repeated its earlier finding that Khan had not earned custody credits in this case because he had been in custody for another matter and his sentence on that matter would not

31

be completed until August 13, 2022. Khan objected, contending his sentence was "already done on July 14, 2022." Khan agreed with the court that his sentence was for 1,085 days and that he needed 548 days of actual time to complete it. But by his calculation, his sentence was completed on July 14, 2022. The court stated that it explained its calculation "in great detail" at the prior hearing and would not go over it again. The court also reminded the parties that it had requested that any alternative calculation be submitted in writing. "So, again," the court ruled, "the credits in this case are none. You will begin earning credits in this case on August 14 of 2022."

On appeal, Khan contends the trial court erred by basing its calculation on "an out-of-court communication" with another trial judge, when it should have calculated and awarded custody credits based on the "official probation report." First, the court did not simply *rely* on its conversation with the other judge, but used court records to perform its calculation. Second, Khan was not requesting custody credits based on information in the probation report, as that report had overlooked that Khan was serving his sentence for the prior misdemeanor offenses while awaiting trial in the current case. At the sentencing hearing, Khan sought custody credits based on his representation and belief that his misdemeanor sentence was complete on July 14, 2022. The court rejected the request because Khan provided no evidence to support it, despite the fact that the court had flagged the issue at the prior hearing.

In his reply brief, Khan argues the trial court erred because it relied "entirely on non-publicly disclosed information" in Khan's prior case file, and "never shared those records" with Khan. This distinct claim of error is forfeited. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29 [point raised for the first time in reply brief may be deemed waived].) Moreover, the allegation that Khan did not have access to his other case file is difficult to

reconcile with the record, which shows that his advisory counsel questioned the court's calculation of custody credits at the first session of the sentencing hearing, and that Khan himself argued that his own calculation established that he completed his prior sentence on July 14, 2022.

Khan points to no evidence in this record to support his contention that he completed his prior sentence in July 2022. Thus, he fails to show error in the court's determination that Khan did not earn any custody credits as of the time of sentencing in this matter. (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 549 [defendant's burden to provide record on appeal that "affirmatively shows" error, and "uncertainty in the record must be resolved against the defendant"]; accord, *People v. $17,522.08 United States Currency* (2006) 142 Cal.App.4th 1076, 1084 ["Error will never be presumed and must be affirmatively shown"].)

## V. Khan's Second Amendment Challenge Fails

Khan challenges the constitutionality of his conviction for violating section 29825(a) by purchasing or receiving a firearm while subject to a restraining order or protective order, and his conviction for violating section 30305(a) by owning or possessing ammunition in violation of a protective order. Khan contends these California statutes violate the Second Amendment to the United States Constitution, as construed in *New York State Rifle & Pistol Assn., Inc. v. Bruen* (2022) 597 U.S. 1.

Khan's appellate briefs contain no analysis to support his claim that *Bruen* renders sections 29825(a) and 30305(a) unconstitutional, but instead adopt the analysis in *United States v. Rahimi* (5th Cir. 2023) 61 F.4th 443, a decision that was recently reversed by the United States Supreme Court. (*United States v. Rahimi* (2024) 602 U.S. __ [144 S. Ct. 1889, 219 L.Ed.2d 351] (*Rahimi*).) Notwithstanding Khan's acknowledgment that his entire

Second Amendment claim "stands or falls" with *Rahimi*, we granted both parties leave to file supplemental briefs after issuance of the Supreme Court's decision. In a three sentence response, Khan concedes that *Rahimi* is "controlling authority" and "submits" his claim.

*Rahimi* was a facial challenge to a federal statute that bars an individual who is subject to a restraining order from possessing a firearm under specified circumstances. (*Rahimi*, *supra*, 144 S. Ct. at p. 1898.) Rejecting the challenge, the Court found "ample evidence that the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others." (*Id.* at pp. 1898-1899.) Accepting Khan's concession that *Rahimi* applies here, we summarily reject his Second Amendment challenge, as he provides no analysis to support concluding otherwise. (See *People v. Hovarter* (2008) 44 Cal.4th 983, 1029; *People v. Murray* (2008) 167 Cal.App.4th 1133, 1143.)

## DISPOSITION

The judgment is affirmed.


TUCHER, P. J.


WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.


*People v. Kahn* (A165941)